UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11620-DPW

| | |
|---|---|
| BL(A)CK TEA SOCIETY, ET AL., | ) ) ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| THE CITY OF BOSTON, | ) ) |
| Defendant | ) ) |

## DEFENDANTS' OPPOSITION TO THE PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

Plaintiffs seek the following orders from the Court relating to the administration of the soft zone during the Democratic National Convention:

The City opposes the plaintiffs' requests, as the modifications they demand place insupportable risks on public safety. Each of plaintiffs' requests, and the specific reasons for the City's opposition thereto, are addressed below:

    1.    An order that the Boston Police are prohibited from denying access to the streets in the soft zone "unless a clearly defined emergency exists"

The City's expectation is that it will not be necessary to limit access to the soft zone, as the City expects that it can accommodate 12,000 people before reaching capacity. The City does not project that this number of people will be present in the soft zone at any one point in time.

Plaintiffs offer no detail as to what they deem a "clearly defined emergency." Would threats passed between opposing groups be considered a "clearly defined emergency," or would the police be required to wait to clear an area until the first blows are struck? Is the potential threat posed by a motor vehicle left running at the entrance to Lancaster Street an emergency such that the police would be permitted to clear pedestrians away from that access point until a bomb team investigated?

The police deployed in the soft zone will be required to assess and take appropriate action to address situations in the zone as they arise. This may require temporarily denying access to portions of the soft zone, and legitimate law enforcement reasons may mandate that prophylactic action be taken <u>before</u> a situation becomes "emergent." These are issues for which the police are specially trained. It should be left to the discretion of the police to determine when and how to intervene in situations that may arise in the soft zone. (Ex. A, Dunford affidavit)

2. An order that the BPD allow the plaintiffs to engage in all expressive activities on the sidewalk on the south side of Causeway Street, including marching, placing tables and chairs for the distribution of literature, and displaying signs and banners.

The City incorporates herein its objections to allowing marches on Causeway Street sidewalk, made in the related action *Coalition to Protest the Democratic National Convention v. City of Boston et al.,* and filed with this court on July 20.

The City further objects to the demand that the sidewalk on Causeway Street be opened not only to organized marches, but also to the placement of tables and chairs. Plaintiffs and other demonstrators can distribute leaflets and handbills as they wish on Causeway. The placement of temporary furniture in this area will aggravate an already overcrowded situation.

The increased number of obstructions will also hamper the ability of the Boston Fire Department to effectively respond to any fire emergency on Causeway Street. (See affidavit of Chief Paul Burke, attached as Ex. B)

3. An order that the BPD reconfigure the fencing at the demonstration zone, so that a distance of no more than 10-12 feet separates the delegate walkway from the demonstration zone.

The City refers to the Affidavit of Louis S. Vasta, attached hereto as Ex. C. Mr. Vasta is the transportation specialist who has had overall authority to create the transportation plan, including the bus terminal. It is his opinion that any modification of the demonstration zone that requires encroachment on the space currently set aside for the bus terminal would place an intolerable burden on the overall transportation plan itself, and would potentially jeopardize the delegates within the terminal.

Lest the plaintiffs claim surprise at the details spelled out in Mr. Vasta's affidavit, the City notes that the first time it became aware of the plaintiffs' dissatisfaction with the layout of the demonstration zone was the morning of July 21 and it was only during the view of this date that the City learned of plaintiffs' claims that there would be "no problem" extending the demonstration wall.

Mr. Vasta explains that the space between the existing head house and the demonstration zone fence, at the southernmost end of the terminal, is necessary to move delegates toward the southernmost berth, particularly at the end of the evening hours when a massive exodus from the FleetCenter is expected. Placement of bus queues to facilitate an orderly egress of delegates necessitates a pathway so that delegates assigned to southernmost bus bays may traverse the space without walking at the front of the buses

3

(where other passengers will be trying to board) or in the interior of the terminal itself (where buses will be looping in and out of the terminal).

The design of the space is critical because, as sworn to by Mr. Vasta, alternative transportation is unlikely to be utilized by most delegates. Thus, most of the 14,000 delegates and numbers of media personnel will be using the terminal – unlike in past conventions, where space outside the convention hall allowed for parking and public transportation alternatives. Also as sworn by Mr. Vasta, the space allotted to create this terminal is smaller by at least half than in prior conventions, although the burden of passengers is anticipated to be much greater.

Plaintiffs' request to limit the area between the bus berths and the demonstration zone to 10 – 12 feet is not feasible or safe. This demand must be denied.

4. An order that the netting around the demonstration zone fence (lining the fence and draped above the fence to the elevated train tracks) be removed.

As detailed in Superintendent Dunford's attached affidavit, the purpose of the overhead netting is to prevent any demonstrator from throwing any object into the delegate bus terminal. The netting is open and one can easily see through it. It does not restrict the movements of anyone inside the zone.

The webbing over the fence is also necessary to limit demonstrators from hurling items through the fence and from spraying any delegate in the bus terminal – a safety precaution that would become even more necessary if the court accedes to plaintiffs' demands to shorten the distance between the two areas. Based on prior experiences, this kind of behavior is foreseeable at this convention. The City has committed to allowing free access of people into the zone, and will not be searching for wrist-rockets or confiscating water bottles. The webbing is a non-intrusive means of deflecting

4

projectiles, and does not limit the sight or sound access of the demonstrators to the delegates. The demand that the webbing be removed should therefore also be denied.

    5.    An order that one of the two fences around the demonstration zone be removed.

The City has placed two fences around the demonstration zone, in order to minimize the risk that the fence will be breached or toppled. It has been the experience at other demonstrations that groups have knocked over fences – leading to threats to the safety of the protectees, the demonstrators and police. The City anticipates that the placement of a double fence will discourage this kind of unlawful activity, or if it does not, at least provide the police with an opportunity to intervene before a breach is achieved.

It has been the experience in other demonstrations that this conduct has occurred, and with sufficient frequency to make it a reasonably foreseeable risk that the police must anticipate and plan to mitigate. Plaintiffs have articulated no reason for their objection to the fencing, other than that it prevents them from reaching through to the delegates. Candidly, the City does not desire to make the delegates accessible to be touched by the demonstrators, and does not believe there is any legal requirement that this proximity be afforded them.

    6.    An order allowing the placement of tables and chairs within the soft zone at plaintiffs' discretion.

The spaces inside the soft zone vary in their spaciousness (or lack thereof), as was evident during the view taken by the court and the parties today. The City is of the opinion that placement of furniture within the soft zone presents problems because it

5

takes up additional space, and because if public disorder were to occur, furniture could be used offensively (against both other persons in the soft zone and against police).

Additionally, the screening that would be necessary to admit furniture into the soft zone would cause delays and congestion concerns at entry points into the soft zone. One reason for the ban on motor vehicles (beyond reducing the obvious threat that a car or truck could be used to breach the hard zone) was to ensure that no weapon or explosive could be smuggled into the soft zone. If people are permitted to carry in tables and chairs, the police will be required to step up scrutiny to ensure that the furniture is not used to conceal (or be converted into) weapons. This could cause extensive delays in the free movement of people in and out of the soft zone.

As the above amply demonstrates, the City, in designing the soft zone and the demonstration area, has taken pains to ensure that it has not imposed restrictions that impose more burdens than are reasonably necessary to provide for the safety of <u>all</u> the people in these zones. The City is not required to utilize the least restrictive means to accomplish its safety plan. The evils the City proposes to protect against are real, and the efforts employed to thwart those evils are specifically targeted. "Plaintiff[s are] not entitled access to every or even the best channels or locations for their expression … Determining whether ample alternatives are available does not depend on the preference of the speaker for one method [of communication] or another. *United for Peace and Justice v. City of New York et al.,* 243 F.Supp. 2d 19 (S.D.N.Y, 2003).

The Democratic National Convention has been designated a National Special Security Event by order of President Bush (see Aff. Of Scott Sheafe, Ex. B to City's

6

Opposition of *Coalition* motion for preliminary injunction). This designation affirms that the DNC is an extraordinary event – indeed, one unlike the City of Boston has ever hosted. As the Central District of California court held, regarding the 2000 DNC, "[f]ew events in this country's national political life are more significant than the quadrennial conventions of the two major political parties." *SEIU v. City of Los Angeles,* 114 F.Supp.2d 966 (2000).

It must be acknowledged that this convention is the first major political convention held in this country after the terrorist acts of September 11, 2001. The City has made utmost efforts to ensure that the ability of people to move freely throughout the streets, even to the area closest to the FleetCenter itself, are not unduly burdened – but it has done so with the full realization that the public safety plan must be cognizant of the threats that attend an event of this significance. This event is not akin to a rock concert or a Bruins game. Those events do not draw the attention of persons intent on disrupting the democratic process. Political conventions, attended by prior presidents and aspiring candidates, do. This is why the President has designated the convention a National Special Security Event, why Secret Service is devoting three days prior to the event to sweeping a hard zone, and why greater security is necessary to protect the event and the City.

The City therefore respectfully asks that the court, following the well established precedent of *Clark v. Comm'y for Creative Non-Violence*. 468 U.S. 288, 293, 104 S.Ct. 3065 (1984) and *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746 (1989), deny the plaintiffs' request for injunctive relief.

Respectfully submitted,
DEFENDANTS CITY OF BOSTON
ET AL.,
By their attorneys
Merita A. Hopkins, Corporation Counsel


__/s/ Mary Jo Harris _____
Mary Jo Harris, BBO # 561484
Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA 02120
(617) 343-4550

8