UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11620-DPW

_____
                                                )
BL(A)CK TEA SOCIETY, ET AL.,         )
                                                )
        Plaintiffs           )
                                                )
        v.                      )
                                                )
THE CITY OF BOSTON,   .,         )
                                                )
        Defendant          )
_____)

## AFFIDAVIT OF ROBERT DUNFORD

1. I make this affidavit on my personal knowledge and belief.

2. I have been asked to review the requests of the Bl(a)ck Tea Society in their motion for a preliminary injunction and offer my response to those requests.

   **"Clearly defined emergency"**

   I am responsible for informing the police deployed to secure this event with the necessary information and training necessary to do so. I do not understand the plaintiffs' definition of a "clearly defined emergency" and strongly oppose any order that would limit the discretion of the police in the field to act to interrupt or intercept a potential threat. Our officers are trained and expected to act within the confines of the Constitution and laws of the Commonwealth, and I would oppose any restriction on their police powers that would limit their ability to take what, in their judgment, is necessary at a given time.

   **Activities and placement of furniture on Causeway Street sidewalk, and inside the soft zone**

   To allow people to carry furniture into the soft zone would require the police to conduct searches for possible concealed weapons secreted in the furniture (for example, tied to bottoms of tabletops, wedged inside stacks of chairs, etc.). The risk of concealed weapons is one reason for the outright vehicle ban, and that risk would be re-opened if furniture were allowed.

Plaintiffs have not offered any description of the tables and chairs that they seek to bring into the soft zone with them. Large furniture and collapsible furniture that may be taken apart may be objectionable not only because of the obstacles they pose, but because they may be used offensively as weapons.

**Altering the fencing to reduce the walkway from the buses to the fencing to 10-12 feet.**

The set-off between the buses and the demonstration area is required for a number of reasons. It allows ample space for large numbers of delegates to safely disembark, get out of the way of moving buses, and move toward the credentialing check and magnetometer village at the Causeway end of the bus terminal.

The current space also minimizes the risk that a delegate will be hit with an object or liquid from the demonstration area. It lessens the opportunity that delegates will be intimidated by aggressive demonstrators, by allowing them some space to retreat from the demonstration zone if they choose to.

In my opinion, limiting this space to 10 – 12 feet from the fence increases the risk that delegates will move back away from the fence, and into the path of moving buses. It also increases the opportunity for unruly elements in the demonstration zone to egg each other on, because in my experience, when a group behave with hostility toward a target and that target reacts to the hostility, it encourages the group to step up its activities. I reasonably understand that at least some of the demonstrators coming to this event will be in strong disagreement with the policies expressed by the DNC, and will express these views vehemently. I believe that the space that we have allocated will lessen the chance that this volatility becomes violent.

**Removing the double fence, netting above the fence line and the mesh from the fence**

While I was not present at the last DNC, I am informed by law enforcement personnel that at the 2000 convention in Los Angeles, some demonstrators threw objects or used sling shots to hurl projectiles at delegates in the bus area. I understand that on one evening at the 2000 DNC, bus departures at the end of the night were delayed for hours as demonstrators rained objects into the bus depot.

The double fencing, set-off space and overhead netting is intended to foreclose this possibility. It is unlikely that a launched projectile will be able to pass through the double fencing, which has been positioned to reduce the openings in the chain-link. The overhead netting will deflect objects being hurled over the fence. The set-off space is intended to place the delegates out of harms' way,

should some object get through the fencing, while still leaving them close enough to the demonstration area to be within sight and sound distance.

.   I further understand that during the 2000 DNC, some demonstrators squirted liquids at the delegates. I understand that it has become increasingly common in civil disturbances for some demonstrators to spray bleach or urine at police personnel. In my judgment, the use of the netting on the demonstration fence is a reasonable precaution against this kind of disruption.

3. I have had my staff measure the interior of the demonstration zone, see attached diagram (Ex. 1), and report the following:

> The length of the zone, north to south, is 300'. The FleetCenter is located at the north side of the zone (top of page).
>
> The space from the jersey barrier (supporting the fence) to the interior metal girder is 25' (see "A" on attached diagram)
>
> The space from the metal girder to the near (west) side of Haverhill Street is 24' (see "B" on attached diagram).
>
> The width of Haverhill Street is 30' (see "C" on attached diagram).
>
> The total square footage of the demonstration zone is 25,800.

4. I have also been asked to provide footage and capacity for the streets inside the soft zone. Those calculations are provided in the attached sheet (Ex. 2).

> Canal St. = 36, 816 sq ft   or 5259 people
> 949 x 39 = 36,816 sq. ft.
> 36,816 div. 7 = 5259 people
>
> Friend St. = 20,608 sq ft   or 2944 people
> 296 x 23 = 20,608
> 20,608 div. 7 = 2944 people
>
> Portland St. = 21, 556 Sq ft or 3,084
> 635 x. 34 = 21,556
> 21,556 div. 7 = 3,084 people
>
> The total capacity for these three streets is 11, 287 people.

Signed under the pains and penalties of perjury this 21st day of July, 2004

__/s/ Robert Dunford_____

Superintendent Robert Dunford