UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (BOSTON)

CIVIL ACTION NO. 04-11620-DPW

BL(A)CK TEA SOCIETY, ET AL., )
)
Plaintiffs )
)
v. )
)
THE CITY OF BOSTON, )
)
Defendant )

## AFFIDAVIT OF LOUIS S. VASTA

1. My name is Louis S. Vasta, and I make the following declaration based upon my professional expertise and personal knowledge.

2. I am a specialist in the field of transportation logistics. I have fifteen years of professional experience and an engineering degree. I have had my own transportation consulting business for ten years and have designed and managed safe transportation plans for over two hundred large-scale special events around the world. I am an expert in the design and implementation of plans for secure transportation of large capacity crowds at high profile special events, including designated National Security Events.

3. Specifically, I have overseen the safe transportation of principals, participants and spectators at three international Olympic Games, six NFL Super Bowls, eight NBA All-Star Games, five Major League Baseball All-Star games, six U.S Open golf tournaments, two World Cups, three previous Democratic National Conventions and two United States Presidential Inaugurations.

4. In 2000, I was the Deputy CEO and Director of Operations for the Democratic National Convention in Los Angeles, which was also a designated National Security Event; in this position I oversaw and managed both the Security and Transportation operations for the entire Convention. The transportation design and coordination was one of the principal tasks over which I had supervisory

oversight and control. I was the Director of Transportation for the Democratic National Convention in 1996 held in Chicago.

5. Currently, I am an expert consultant to the 2004 Democratic National Convention Committee, Inc. ("DNCC"). My work scope consists solely of oversight of the design and implementation of the secure transportation plan for the 2004 Democratic National Convention. I am responsible for the development and design of the bus terminal.

6. For each Convention, the DNCC designs a transportation system whose purpose is to move the delegates and other invited guests safely from various points in the city to the site of the Convention. As a critical component of the overall DNCC security plan, DNCC buses are highly secured vehicles. They are swept for explosives and other dangerous objects by the United States Secret Service, staffed by Boston Police Department officers and access-controlled through limited DNCC-issued credentials.

7. For 2004, it is anticipated that more delegates and guests will utilize the transportation system than for any previous Convention, due to limited alternatives. The bus terminal is bounded by North Washington Street on the south, Causeway Street to the North, a business complex to the east, and the former MBTA Green Line to the west.

8. The safe transportation of the delegates and credentialed guests during the 2004 Convention period is the most complex logistical challenge of my career. The particular challenge of designing a bus terminal for such a large-scale secured event is in striking the balance between efficient movement of participants while ensuring the safety of those same participants and of the public at large. The extremely constrained space around the FleetCenter poses extraordinary obstacles, both as to security and logistics, as can be illustrated by comparison to previous conventions: in 1996, in Chicago, the DNCC had approximately three times as much square footage in which to create a secure load-in and load-out area for the transportation of Convention delegates. In 2000, in Los Angeles, there was twice as much space.

9. Additionally, in prior conventions, supplemental private transportation and parking options were available where necessary. This year, options for private transportation facilities are dramatically limited at any point close to the FleetCenter.

10. As a result, the DNCC has designed a transportation plan that will accommodate virtually the full number of delegates and credentialed guests on the Convention bus system. For four days, roughly 14,000 people will be transported each day to and from sixty-three hotels throughout the greater Boston area within a highly scheduled timeframe.

11. The transportation plan is a fundamental and integral part of Convention security planning. Since 2003, intensive planning and consultation has occurred among various transportation and logistics experts, including federal, state and local officials in conjunction with Convention planners. The current design of the transportation system, of which the bus terminal is a critical component, has been reviewed by those same officials. The development of the plan has been widely publicized for over a year.

12. By conscious and careful design, the bus terminal system attempts to insure the safe passage of thousands of delegates within a confined space for each evening of the Convention.

13. After numerous engineered drawings and extensive consultation, the DNCC conducted a full-scale, staged dry run of the entire transportation plan, including a mock-up of the bus terminal using the existing dimensions of the final plans for the bus terminal. See Exhibit A, attached hereto.

14. An indispensable component of our design plan was to afford the public sight and sound to the Convention delegates. It was my understanding that if the bus terminal was designed in such a way as to block the sight lines of the demonstration zone, it would be subject to challenge. It was, and is, a major priority for me that the design allows for sight and sound between the demonstrators and the delegates.

15. As a result of our observations at the bus depot mock-up, we determined that the design of the bus terminal should utilize an overall horseshoe-shaped curb design with a saw-tooth pattern for the individual buses in order to maximize the utility of the space and to ensure that the sight and sound concerns were addressed.

16. By parking the buses in the diagonal berths afforded by a saw-tooth pattern, we have prevented the buses from becoming "walls" that would block sight lines from the demonstration zone. This design, however, requires adequate space for a "U" turn in the depot: the "cul de sac" where the buses move in order to reach the western side (closest to demonstration zone) must be sufficiently wide to allow for the bus turn radius. The cul de sac is fifty-two (52) feet wide, which is the tightest possible space for a bus to execute a U-turn without having to back up (the "turn radius"). The objective is to move the buses in and out as expeditiously as possible, minimizing security risks to pedestrians and passengers.

17. The saw-tooth design also requires that the interior space, between the eastern and western flanks of berths, be at least fifty-three (53) feet wide. This space is necessary so that buses, backing out of the berths, do not hit the buses parked behind them when backing up, cutting wheels and turning out of the terminal.

18. The buses will pull into their berths, and passengers will disembark along the outside of the horseshoe pattern onto the pedestrian walkway leading to the

magnetometers at the hard security perimeter. It is imperative that there be an allocated pedestrian zone for the safe and effective operation of this design. During the day, approximately 14,000 credentialed guests will proceed from their respective buses to the northern end of the terminal for a credentials and magnetometer check. The demonstration area affords sight and sound of all of these credentialed guests as they embark and disembark in the bus terminal.

19. The biggest logistical challenge is the egress or load-out at the end of each Convention evening. Unlike the load-in, at the end of each evening we are faced with a mass egress and must load out roughly 14,000 people within an hour after the end of proceedings inside the FleetCenter. The majority of these people will not atomize to subways, cabs, or private cars, but primarily will move, en masse, to the bus terminal.

20. The buses will be parked in pre-marked berths so that delegates will know where to go to board their bus to return to the hotels. It is not feasible to allow people to swarm at the entrance of a bus; the overflow of people could lead to an individual getting in the way of departing or arriving buses, causing delay and exposing the delegates to obvious physical danger.

21. The areas between the horseshoe-shaped bus curb and the demonstration area or the contiguous business complex will not be an unobstructed area. In order to manage this crowd, on each evening rope and stanchioned areas will be installed on the pedestrian walkways adjacent to the buses for delegates to queue for buses (similar to roped off lines in airports). These serpentine lines will require anywhere from fourteen (14) feet to twenty-eight (28) feet of space, depending upon the numbers of delegates assigned to each bus route.

22. I understand that the plaintiffs in this case are asking the court to consider ordering the eastern-most side of the demonstration zone be extended further into the bus terminal. In my opinion, this would create an extremely dangerous situation, in that the space currently planned to create these queues for waiting passengers would be absorbed or seriously reduced. The limited space currently available is the minimum space required for safe ingress and egress of the passengers.

23. We planned for a maximum of eighteen (18) berths to be occupied on each side of the terminal. With the creation of the bus queues, which will range in size from fourteen (14) to twenty-eight (28) feet of space, the remaining six- (6) foot walkway outside of the queued area will allow guests to pass. Each delegate is assigned to a specific bus route, and must be able to freely move to that bus berth. Guests' access cannot be blocked by the bus queues; it is imperative that the delegates not be inadvertently directed into the middle of bus traffic within the terminal.

24. I estimate that at the egress point, approximately seven thousand (7000) people will be moving through each side of the bus terminal in search of their return bus berth.

25. I understand that the plaintiffs have represented that the southernmost side of the demonstration zone fencing could be extended some distance east, without adversely affecting the bus terminal. This assessment is incorrect. If the southernmost end of the demonstration zone were to be extended, the path necessary for delegates to move behind the bus queues to the berths at the southern end of the terminal would be blocked by the existing headhouse in that space. See Exhibit A. There would exist no way for the delegates to traverse to the southernmost berths without passing directly in front of the buses, which in my opinion would both constitute both a grave safety concern and an intolerable logistical obstacle.

26. In my experience at two prior conventions, it is my opinion that an effective, safe, and relatively expeditious transportation plan is necessary in order to assure that the delegates are moved safely into and out of the Convention hall. Assuring the safe transportation of the delegates to the Convention proceedings is of vital importance to the success and security of the Convention.

27. I affirm that, in my opinion, there is no logistical way to reduce the footprint of the current bus terminal without jeopardizing the safety and security of all Convention participants.

Signed under penalties of perjury this 22nd day of July, 2004.

_____
Louis S. Vasta